IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| R&J CONSTRUCTION SUPPLY COMPANY, INC. n/k/a CCS CONTRACTOR EQUIPMENT & SUPPLY, INC., <br><br> Plaintiff, <br> v. <br><br> SAM JUMA, <br><br> Defendant. | No. 15 C 4135 |

MEMORANDUM OPINION AND ORDER

R&J Construction Supply Company, Inc., now known as CCS Contractors Equipment and Supply, Inc. ("Supply"), filed an adversary complaint against Sam Juma ("Juma") arguing that his debt to Supply was non-dischargeable in bankruptcy under the statutory exception for "willful and malicious" injuries to property. 11 U.S.C. § 523(a)(6).

Before me is Supply's appeal from the bankruptcy court's ruling that Juma's debt was indeed dischargeable. For the reasons stated below, I affirm the bankruptcy court's judgment.

I.

In 2005, Juma's father in law introduced him to Daniel Vaughn ("Vaughn"). R. 365.[1] Juma was a truck driver in his mid-

---

[1] All record citations refer to the Page ID number stamped in the upper right-hand corner of electronically filed documents.

20s; Vaughn, in contrast, was a general contractor in his late 30s or early 40s. R. 364-65, 367. Vaughn proposed to Juma that they form a partnership to build a two-flat residence at 4401 West 53rd Street in Chicago, Illinois. R. 275, 367-68. Under Vaughn's proposal, Juma would be responsible for financing the project while Vaughn would manage the onsite construction. *Id*. After the building was finished and all loans had been repaid, Juma and Vaughn planned to split any profits evenly. R. 278. Juma had no experience in residential construction, but he trusted Vaughn, who had a good working relationship with Juma's father in law. R. 367-68, 282.

Vaughn owned the vacant lot at 4401 West 53rd Street and transferred the title to Juma so he could apply for a construction loan. R. 274. Juma then formed a company called Sam's Construction, Inc. ("Sam's) and obtained a line of credit. R. 269, 369. Juma operated Sam's out of a single family house that he owned and rented to his parents. R. 282. All of Sam's corporate records were eventually moved to Vaughn's residence. R. 272.

Meanwhile, Vaughn applied for a building permit from the City of Chicago. R. 277. Juma, who saw the architectural plans submitted with the permit application, knew that a cement foundation would need to be poured. R. 276-77, 284. When asked whether he knew that forms would be needed to pour the

2

foundation, Juma testified, "I did not have a clue...I didn't even know what forms are [sic], sir." R. 285.

Vaughn was responsible for ordering all materials and equipment for the project, but he sometimes asked Juma to complete paperwork to draw on the line of credit. R. 369. In August 2005, Vaughn told Juma that some equipment was needed for the second phase of the construction project. R. 291. At Vaughn's direction, Juma filled out a credit application from Supply, which Vaughn then submitted. R. 299. Juma did not know that the purpose of the application was to rent concrete forms to pour the foundation. R. 300. Vaughn signed for the forms when Supply delivered them to the construction site on August 9, 2015. R. 307-8, 358-60. Juma never saw the delivery tickets for the forms or the forms themselves even though he visited the site once or twice a week during the six month construction project. R. 285-86, 316, 318, 326.

Juma periodically received invoices from Supply, but he never read them. R. 301. Instead, Juma simply forwarded the invoices to Vaughn. R. 300. Juma started reading the invoices only when Supply called him about missed payments and to demand the return of the concrete forms. R. 301. By the time Juma approached Vaughn about the problem, the forms were no longer at the construction site. R. 304. To this day, Juma does not know what happened to the forms. R. 305, 309, 315.

On December 6, 2005, Supply sent a letter to Juma demanding $9,012.24 in past due payments and $42,514.30 plus tax for the cost of the forms. R. 312-13. Supply's letter noted that it had not received a single payment from Sam's Construction. R. 149. Juma asked Vaughn multiple times what happened to the forms and underscored that he (Juma) was legally responsible for them. R. 316-17, 319-20. Vaughn said he would take care of the problem, but he never told Juma where the forms were located. R. 317. Juma made follow up phone calls to Vaughn--and even met with him in person a few times--but the most Vaughn said was, "I'll take care of it." R. 324-25.

Vaughn eventually moved to Ireland, but he remained in communication with Juma by cell phone through at least 2006. R. 345-46. Juma kept asking Vaughn where the forms were located, but Vaughn never revealed that information. R. 375. According to Juma, "I kept talking to Danny [Vaughn] to try to push him to get a location or for him to return them [the forms] back and just never had any luck." R. 321.

At first, Juma believed that Vaughn would make good on his promise to take care of the situation with Supply. R. 370. Juma testified, "I just felt that he [Vaughn] would show good faith and return them." R. 373. After a few of Vaughn's assurances proved to be hollow, Juma lost trust in him. R. 374.

4

Juma realized that Vaughn was dishonest and now admits that he had no basis to trust him. R. 375-76.

On January 27, 2006, Supply sued Sam's Construction, Juma, and Vaughn in the Circuit Court of Cook County. *See R&J Constr. Supply Co., Inc. v. Sam's Constr., Inc.*, No. 2006 L 0962 (Ill. Cir. Ct.). The operative complaint asserted claims for breach of contract, bailment, and conversion. Vaughn arranged for one attorney, Ian Erdos ("Erdos"), to represent all three defendants. R. 213-14, 220, 328. Erdos withdrew shortly before Juma's answer to the amended complaint was due. R. 216. Around the same time, Juma was still trying to communicate with Vaughn, through Erdos, about returning Supply's concrete forms. R. 234.

On April 26, 2007, Juma filed a pro se answer in which he denied liability and asked that Supply's claims against him be dismissed. R. 222-23. Supply then moved for summary judgment and noticed its motion for presentment on June 19, 2007. Juma gave conflicting testimony about whether he received a copy of Supply's motion for summary judgment. *Compare* R. 219 (acknowledging receipt of motion) *with* R. 224, 229-30 (claiming not to remember whether he received motion). It is undisputed, however, that Juma did not respond to Supply's motion or appear at the June 19 hearing. R. 219. The court granted Supply's motion for summary judgment on the date of presentment. Juma does not recall whether he received a copy of the judgment. R.

224-25. The critical paragraph of the judgment, which Supply's attorney wrote by hand, states:

> (c) Judgment is entered against Sam Juma in the amounts of $80,335.08 and $46,340.59 (for the conversion of the construction forms) and the total judgment is $126,675.27. *The court enters a finding of malice in regards to the conversion of the leased construction forms.* Execution may issue on the judgment.

R. 58 (emphasis added).

Juma filed for bankruptcy in July 2013, but did not list or schedule his judgment debt to Supply until January 2014. Supply then filed an adversary complaint against Juma alleging that the debt was non-dischargeable under 11 U.S.C. § 523(a)(6) because it was for willful and malicious injury to property.

Before trial on Supply's claim, Juma moved in limine to bar Supply from introducing the state court's finding of malice. The bankruptcy court granted Juma's motion on the ground that the malice finding was not entitled to collateral estoppel effect because (a) the issue was not actually litigated in state court and (b) the finding was not necessary to the state court's judgment against Juma on Supply's conversion claim.

Supply's adversary claim proceeded to trial, where only two witnesses testified: Juma and the Supply employee who sent him a demand letter on December 6, 2005. The court believed Juma's testimony and held that he did not inflict a willful and malicious injury on Supply's property. The court said it was

"at a loss" to see how Juma's actions showed willfulness, defined as "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998) (emphasis in original); *see also First Weber Grp., Inc. v. Horsfall*, 738 F.3d 767, 774 (7th Cir. 2013) (debtor acts willfully if his actions are "substantially certain" to result in injury).

> What did Juma do once he realized that the forms had been delivered to the construction site, used by Vaughan, and never returned? He called Vaughan several times, even meeting with him face to face, in attempts to get the forms returned to their rightful owner. Vaughan repeatedly assured Juma that he would take care of the situation. How were these actions "substantially certain to result in injury?" While Juma eventually realized that Vaughan was leading him on, his continued attempts to find the forms are the very opposite of an intent to injure Supply.

*In re Juma*, 530 B.R. 682, 693 (Bankr. N.D. Ill. 2015).

With regard to malice--defined in this context as acting "in conscious disregard of one's duties or without just cause or excuse," *Matter of Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994)--the bankruptcy court "found very credible Juma's testimony that he asked Vaughan 'multiple times' what happened to the forms, and that the older, more experienced Vaughan repeatedly told Juma that he would 'take care of it.'" *In re Juma*, 530 B.R. at 694.

II.

Supply has appealed the bankruptcy court's final judgment on the discharge exception claim. I have jurisdiction over Supply's appeal under 28 U.S.C. § 158(a). The bankruptcy court's legal conclusions are reviewed de novo while its factual findings are reviewed only for clear error. *See In re Berman*, 629 F.3d 761, 766 (7th Cir. 2011). "Where the trial court correctly states the law, its determination of whether the facts met the legal standard will be disturbed only if it is clearly erroneous." *Id*.

A.

Supply's first argument on appeal is that the bankruptcy court effectively overturned the state court's finding of malice in violation of the *Rooker-Feldman* doctrine. Whether the bankruptcy court ran afoul of *Rooker-Feldman* is subject to de novo review. *See Arnold v. KJD Real Estate, LLC*, 752 F.3d 700, 704 (7th Cir. 2014).

After losing on the collateral estoppel issue, Supply attempted to argue at the motion in limine hearing that the *Rooker-Feldman* doctrine required the bankruptcy court to defer to the state court's finding of malice. R. 337-38. The bankruptcy court accused Supply of attempting to reargue the collateral estoppel issue under a new legal theory. R. 338-40, 342-43. In her written opinion, however, the bankruptcy judge

8

addressed Supply's *Rooker-Feldman* argument on the merits. She held that the *Rooker-Feldman* doctrine had no application because Juma was not a federal court plaintiff attacking a state court judgment against him.

Supply's continued reliance on the *Rooker-Feldman* doctrine in this appeal is misplaced. Tellingly, Supply relies on the *Rooker-Feldman* analysis in a bankruptcy case that was reversed on appeal after briefing in this case was completed. *See In re Littman*, 517 B.R. 847, 862-64 (Bankr. N.D. Ill. 2014) (holding that *Rooker-Feldman* barred debtor from asserting defense to judgment debt at issue in discharge exception proceeding), *rev'd*, No. 14 C 9274, 2015 WL 4932637, at *5 (N.D. Ill. Aug. 18, 2015) (holding that bankruptcy court misapplied *Rooker-Feldman* and should have relied on preclusion doctrines to prevent debtor from circumventing state court judgment).

The fundamental flaw in Supply's argument is the assumption that *Rooker-Feldman* and issue preclusion are interchangeable doctrines. "*Rooker–Feldman* is not simply preclusion by another name." *Lance v. Dennis*, 546 U.S. 459 (2006) (per curiam).[2] At

---

[2] *See also Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005) (criticizing lower courts for allowing *Rooker-Feldman* to "supersed[e] the ordinary application of preclusion law"); *Arnold*, 752 F.3d at 706 (noting that "[c]ourts often confuse *Rooker–Feldman* cases with cases involving ordinary claim or issue preclusion"); *Adams v. Adams*, 738 F.3d 861, 864 n.2 (7th Cir. 2013) (rejecting creditor's reliance on *Rooker-Feldman* instead of issue preclusion); *Long v. Shorebank*

9

its core, *Rooker-Feldman* is a jurisdictional doctrine, yet no one contends that the bankruptcy court lacked subject matter jurisdiction to decide whether Juma's debt to Supply was dischargeable or not. *See In re Littman*, 2015 WL 4932637, at *4 (holding that *Rooker-Feldman* did not bar debtor from defending herself "in an adversary proceeding over which the bankruptcy court had already found jurisdiction" under 28 U.S.C. § 157(b)).

Moreover, "[t]he [*Rooker-Feldman*] doctrine is narrowly confined to 'cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.'" *Arnold*, 752 F.3d at 705 (quoting *Exxon*, 544 U.S. at 284). This case does not fall within the narrow set of circumstances in which the *Rooker-Feldman* doctrine applies. Although Juma lost in state court, he did not file a federal lawsuit "'attacking the [state] judgment itself' or the procedures used in obtaining that judgment." *Id*. (quoting *GASH*, 995 F.2d at 728). Juma is simply defending himself against an adversary complaint filed by one of his creditors. *See In re Littman*, 2015 WL 4932637 at *4 (debtor who

---

*Development Corp.*, 182 F.3d 548, 560 (7th Cir. 1999) (explaining why *Rooker-Feldman* and preclusion doctrines are not coextensive); *GASH Assocs. v. Vill. of Rosemont, Ill.*, 995 F.2d 726, 728 (7th Cir. 1993) (same).

opposes adversary claim to recover judgment debt is not necessarily attacking the judgment itself).

In sum, regardless of whether the state court judgment bars Juma from rearguing certain issues, it did not deprive the bankruptcy court of subject matter jurisdiction to adjudicate Supply's adversary claim. Therefore, the *Rooker-Feldman* doctrine has no application in this case. *See Exxon*, 544 U.S. at 293 (*Rooker-Feldman* does not "stop a district court from exercising subject-matter jurisdiction simply because a party attempts to litigate in federal court a matter previously litigated in state court").

B.

Supply's main argument is that the state court's judgment against Juma for conversion bars him from re-litigating whether his debt to Supply was for a "willful and malicious" injury to property. 11 U.S.C. § 523(a)(6); *see also Grogan v. Garner*, 498 U.S. 279, 284 n.11 (1991) (collateral estoppel applies in adversary proceedings to exclude a debt from discharge).

"[U]nder the Full Faith and Credit Act [28 U.S.C. § 1738] a federal court must give the same preclusive effect to a state-court judgment as another court of that State would give." *Parsons Steel, Inc. v. First Alabama Bank*, 474 U.S. 518, 523 (1986). The Illinois Supreme Court uses a four-part test to determine whether collateral estoppel applies:

11

> First, the issue decided in the prior adjudication
> must be identical with the one presented in the suit
> in question. Second, there must have been a final
> judgment on the merits in the prior adjudication.
> Third, the party against whom estoppel is asserted
> must have been a party or in privity with a party to
> the prior adjudication. Additionally, the party
> sought to be bound must actually have litigated the
> issue in the first suit and a decision on the issue
> must have been necessary to the judgment in the first
> litigation.

*Am. Family Mut. Ins. Co. v. Savickas*, 739 N.E. 2d 445, 451 (Ill. 2000). "Even when the threshold requirements are satisfied, the doctrine should not be applied unless it is clear that no unfairness will result to the party sought to be estopped." *Id*.

The parties spend considerable time debating two issues: (1) whether any issues were "actually litigated" in state court given that Juma failed to oppose Supply's motion for summary judgment and (2) whether the state court's express finding that Juma acted with malice was "necessary" to the conversion judgment entered against him.

There is split authority on the first issue. *Compare In re Catt*, 368 F.3d 789 (7th Cir. 2004) (citing *In re Caton*, 157 F.3d 1026, 1028-29 (5th Cir. 1998), for the position that Illinois courts give collateral estoppel effect to default judgments) *with In re Nikitas*, 326 B.R. 127, 131-33 (Bankr. N.D. Ill. 2005) (opposite). I need not take sides in that debate, however. Whatever preclusive effect the conversion judgment is entitled to, it does not bar Juma from litigating whether his debt was

for a "willful" injury to Supply's property. At most, the state court judgment means that Juma "wrongfully and without authorization assumed control, dominion, or ownership over [Supply's] property." *Cirrincione v. Johnson*, 703 N.E.2d 67, 70 (Ill. 1998). A finding that Juma acted "wrongfully and without authorization" does not show that he acted willfully (i.e., "desir[ed] to inflict...injury or knowing [that injury] was highly likely to result from his act[ions]." *Jendusa-Nicolai*, 677 F.3d at 324.

As for the state court's finding that Juma acted with malice--which comes closer to showing that he intended to injure Supply's property--that finding was not a necessary part of the underlying judgment because no punitive damages were awarded. *See In re Reyes*, 2008 WL 2020501, at *4 (Bankr. C.D. Ill. May 9, 2008) (state court's finding that debtor acted willfully and wantonly in converting creditor's property was not necessary to judgment because no punitive were awarded). As a superfluous part of the state court's judgment, the malice finding does not have preclusive effect.

In short, the conversion judgment entered against Juma does not preclude him from litigating whether he acted willfully. *See First Weber Grp., Inc. v. Horsfall*, 738 F.3d 767, 775 (7th Cir. 2013) (holding that collateral estoppel did not bar debtor

against whom conversion judgment was entered from litigating whether he acted willfully).

C.

On the merits of its discharge exception claim under 11 U.S.C. § 523(a)(6), Supply must show by a preponderance of the evidence that Juma (1) injured Supply's property; (2) willfully; and (3) maliciously. *Id.* at 774. "The term 'injury,' while not defined in the Code, is understood to mean a 'violation of another's legal right, for which the law provides a remedy.'" *Id.* (quoting *In re Lymberopoulos*, 453 B.R. 340, 343 (Bankr. N.D. Ill. 2011)). "Willfulness requires 'a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury.'" *Id.* (quoting *Kawaauhau*, 523 U.S. at 61 (emphasis in original)). "Lastly there is maliciousness, which requires that the debtor acted 'in conscious disregard of [his] duties or without just cause or excuse; it does not require ill-will or specific intent to do harm.'" *Id.* (quoting *Thirtyacre*, 36 F.3d at 700).

Supply's discharge exception claim under § 523(a)(6) falters on the willfulness element. The bankruptcy court heard testimony from Juma on two occasions and found the following story credible:

> [Juma's] uncontroverted testimony was that in the partnership with Vaughan, he was responsible for the financing and Vaughan took care of the construction.

14

> Juma admitted filling out the credit application—there is no dispute that he owes money to Supply--but repeatedly insisted that he had nothing else to do with the concrete forms. When he filled out that credit application, he neither knew nor understood that the purpose was to obtain concrete forms. He gave the application to Vaughan, and later some invoices were mailed to him, but until he started receiving calls "about debts owed and the forms needed to be returned," Juma never read those invoices. "I did not have a clue that I needed forms. I didn't even know what forms are, sir."

*In re Juma*, 530 B.R. 682, 693 (Bankr. N.D. Ill. 2015). Once Juma realized that Supply was demanding the return of concrete forms for which he was legally responsible under the credit agreement, "[h]e called Vaughan several times, even meeting with him face to face, in attempts to get the forms returned to their rightful owner. Vaughan repeatedly assured Juma that he would take care of the situation." *Id*.

Supply attacks the bankruptcy court's credibility determinations as "indefensible." Appellant's Br. at 32. According to Supply, Juma could not possibly have been as ignorant about how a foundation is poured or as trusting of Vaughn as he says he was. I am in no position, however, to second-guess the bankruptcy court's credibility determinations, which are reviewed only for clear error. *See In re Davis*, 638 F.3d 549 (7th Cir. 2011) (noting that "a trial court's credibility determination 'can virtually never amount to clear error'" (quoting *Carnes Co. v. Stone Creek Mech., Inc.*, 412 F.3d

15

845, 848 (7th Cir. 2005))). Supply's incredulity is not enough to show that the bankruptcy court clearly erred in believing Juma's side of the story.

Nothing in Juma's testimony shows that he intended to injure Supply's property. Vaughn did not reveal himself to be untrustworthy until he promised to fix the situation with Supply several times and then failed to do so. From that point forward, Juma admits that he had no basis to trust Vaughn. Yet Juma kept trying to locate Supply's missing property. In fact, Juma was still trying to contact Vaughn on the eve of the summary judgment proceedings in state court. Juma's persistent efforts to locate and return Supply's property are fatal to Supply's contention he intended to cause injury. In retrospect, Juma should not have trusted Vaughn in the first place, but negligence or even recklessness is not enough to exclude a debt from discharge in bankruptcy under 11 U.S.C. § 523(a)(6).

Supply's final argument is that Juma is legally responsible for Vaughn's actions because they were business partners. *See Casablanca Lofts LLC v. Abrham*, 436 B.R. 530, 534-37 (N.D. Ill. 2010) (Guzman, J.) (holding that innocent business partner's debt incurred due to fraud by another partner is non-dischargeable). Assuming for the sake of argument that a debt for "willful and malicious" injury to property cannot be discharged in bankruptcy regardless of whether the debtor (or

16

one of his business partners) inflicted the injury, Supply must still show that Vaughn acted with the requisite state of mind. The record shows that Vaughn initiated the rental of concrete forms from Supply, signed for them upon delivery, and gave Juma the run around when Supply started demanding that the forms be returned. That evidence does not show that Vaughn intended to injure Supply or knew that his actions were substantially certain to result in injury. Without knowing more about Vaughn's state of mind and what actually happened to the forms, I cannot say that the debt Supply wants to exclude from discharge was for a "willful and malicious" injury to business property.

III.

The bankruptcy court's judgment is AFFIRMED for the reasons stated above.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: November 12, 2015